***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford, and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission hereby reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act on June 21, 2002, the date of the alleged injury that is the subject of this claim.
2. An employee-employer relationship existed between the plaintiff Jackie Bradley and defendant-employer Commonwealth Hosiery Mills, Inc. on June 21, 2002.
3. On June 21, 2002, defendant-employer employed three or more employees.
4. Defendant-employer was insured for workers' compensation coverage by Key Risk Insurance Company on June 21, 2002.
5. The Plaintiff's average weekly wage may be determined by a properly completed Form 22 to be produced by defendant-employer. (The contents of that Form result in an average weekly wage of $319.41 and a compensation rate of $212.95.)
 ***********
Based upon all the competent evidence of record, and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 45 years of age at the time of hearing before the Deputy Commissioner. She graduated from high school.
2. Plaintiff has worked as a sewing machine operator for Commonwealth Hosiery, Inc., a company that manufactures assorted hosiery including socks and pantyhose, during two different periods. She first worked for Commonwealth from 1985-87. She returned to work February 6, 1995 as a toe seamer. At all times relevant to the present claim, plaintiff had sewn pantyhose and trousers. Plaintiff's job required her to reach with her right hand and remove a single piece, place it onto a horizontally — oriented blade or fin, slide the piece to her left by use of her left hand, and intermittently adjust the piece on the fin by rotating the cloth upwards or downwards with her left hand.
3. Plaintiff traditionally performed this task on one of two different machines. The first of these was the trouser machine. This machine had blades or fins that were only 4.5 inches wide. The second machine was the pantyhose machine. The blades on this machine were 6.5 inches wide. This was the machine depicted in the videotape admitted into evidence. In May 2002, plaintiff began using the pantyhose machine exclusively.
4. Plaintiff was paid by the piece at the rate of $.24 per dozen pair of trousers and $.22 per dozen pair of pantyhose. The very slowest that plaintiff performed would have been 45 dozen pairs per hour. This would entail plaintiff pulling no fewer than 1,080 socks or trousers onto the blade per hour over the entirety of her shift. Approximately twenty-five percent (25%) of the time, additional adjustments were required to have the pieces properly aligned on the blade.
5. On or about June 21, 2002, plaintiff advised her supervisor, Steve Harper, that she was having pain in her left hand and arm. Plaintiff sought permission to work primarily on the trouser machine because it was easier on her hand to use the narrower blade.
6. Harper corroborated plaintiff's testimony that she had particular difficulty when she had to adjust the pantyhose or trouser on the blade. Harper further testified that Al Gorrod, defendants' expert witness, prepared a videotape of one of plaintiff's co-workers using the pantyhose machine. Harper agreed that this particular co-worker performed her tasks much slower than did plaintiff. For his part, Mr. Gorrod did not ask anyone about the comparative speed with which the work was being performed.
7. Harper and plaintiff agreed that force was required to pull the socking or trouser down the blade. They also agreed that most of the time, trousers had to be adjusted by rotating the piece on the blade, although they disagreed on the amount of flexion used by plaintiff in making that adjustment.
8. When plaintiff complained of pain to Harper on June 21, 2002, he instructed her to go promptly to the company doctor. Plaintiff did so, and was seen by Dr. Yvonne Lowne at First Care that day. She was placed in a splint with a working diagnosis of an ulnar nerve compression. Dr. Lowne restricted plaintiff's repetitive motion to no more than two-thirds of the day, with these restrictions intended to last for two weeks. Plaintiff was then referred to Dr. Gary Kuzma, an orthopedic surgeon who specializes in upper extremities.
9. Dr. Kuzma saw plaintiff on July 22, 2002. He diagnosed plaintiff with carpal tunnel syndrome. Dr. Kuzma further restricted plaintiff's repetitive use of her left hand to one-half of the day and only two repetitive acts per minute. At Dr. Kuzma's request, nerve conduction studies were performed. Because these revealed moderate delays on the left side, Dr. Kuzma recommended an outpatient carpal tunnel release.
10. As result of plaintiff's carpal tunnel syndrome, plaintiff was on restricted light duty under the orders of Dr. Lowne and Dr. Kuzma from June 21, 2002, through August 27, 2002, the date of her carpal tunnel release surgery.
11. Following the surgery of August 27, 2002, plaintiff was restricted to one-handed work until October 17, 2002. At that time, Dr. Kuzma permitted two-handed work with the prior light-duty limitations. Defendant-employer did not have work available within these restrictions. On December 30, 2002, Dr. Kuzma found plaintiff to be at maximum medical improvement, assigned plaintiff a five percent (5%) permanent partial disability rating to her left hand, and released plaintiff to return to regular duty. Plaintiff returned to work for the employer at that time.
12. Although Dr. Kuzma found her to be at maximum medical improvement, plaintiff contends that his finding was premature and that she is not yet at maximum medical improvement. The Full Commission finds there to be insufficient evidence of record to oppose the findings of her treating physician, and thus deems plaintiff to have reached maximum medical improvement.
13. Although plaintiff does have a history of diabetes, Dr. Kuzma excluded that as a probable cause of her carpal tunnel syndrome, because only the median nerves were affected on the nerve conduction studies. Dr. Kuzma stated in his deposition, and the Full Commission finds as fact, that if plaintiff's condition was the result of diabetically-caused peripheral neuropathy, it would be more likely that all of the peripheral nerves would demonstrate delays bilaterally, and not just the left median nerves.
14. Dr. Kuzma sees approximately 300-400 carpal tunnel syndrome patients annually. He is of the opinion, and the Full Commission finds as fact, that repetitive use of the upper extremity will hasten the onset of disabling carpal tunnel syndrome in patients who may be prone to developing carpal tunnel syndrome later in life.
15. Dr. Kuzma opined, and the Full Commission finds as fact, that plaintiff's job placed her at an increased risk for an early onset of carpal tunnel syndrome, as opposed to the general public. He further testified, and the Full Commission finds as fact, that plaintiff's carpal tunnel syndrome restricted her ability to perform her normal employment during the period in which plaintiff recovered from the carpel tunnel release surgery.
16. Dr. Kuzma stated, and the Full Commission finds as fact, that plaintiff's job more likely than not aggravated the onset of her carpal tunnel syndrome. Dr. Kuzma did not believe, and the Full Commission finds as fact, that the job was the sole cause of the carpal tunnel syndrome, but rather that it significantly contributed to its early onset.
17. Defendants retained the services of Al Gorrod to perform an ergonomic evaluation of plaintiff's job. Gorrod opined that there were no ergonomic risks to plaintiff's job. The Full Commission finds that Gorrod's opinions in this matter should be given little weight because he did not assess the number of repetitions plaintiff made in the performance of her job, but rather based his opinions on other workers. Further, Gorrod was not aware of the degree of flexion employed by plaintiff in performing her job, and had no objective scale for measuring forceful exertion. Gorrod's testimony, even if accepted as credible, was only that plaintiff's job would not cause carpal tunnel syndrome. He did not address whether or not the job would significantly contribute to, or otherwise exacerbate, an asymptomatic, non-disabling case of carpal tunnel syndrome.
18. The Full Commission finds that the greater weight of the evidence establishes that plaintiff had an asymptomatic, non-disabling case of carpal tunnel syndrome prior to June 21, 2002. Plaintiff's job placed her at an increased risk for an early onset of carpal tunnel syndrome, as opposed to the general public. In Dr. Kuzma's words, which the Full Commission finds as fact, it is probable that plaintiff's job caused an early onset of disabling carpal tunnel syndrome.
19. Although plaintiff returned to work for defendant-employer after being released by Dr. Kuzma on December 30, 2002, plaintiff testified that she is unable to work at the speed at which she worked prior to the onset of her carpal tunnel syndrome. Dr. Kuzma opined, and the Full Commission finds as fact, that although plaintiff had reached maximum medical improvement, her pain might inhibit her ability to work at the same speed as prior to the onset of her condition. Because plaintiff's earnings are based on performance, plaintiff has suffered a diminution in her earning capacity. Based on her testimony, the Full Commission finds that plaintiff's earnings have been reduced as a consequence of her carpal tunnel syndrome; however, based upon the present record, the Full Commission is unable to find the exact amount by which her earnings have decreased. Thus, the Full Commission deems it appropriate to remand this matter to a deputy commissioner for the taking of additional evidence or further hearing, if necessary, and the entry of an Opinion and Award with findings regarding the extent to which plaintiff has suffered a diminution of her earning capacity for the period following December 30, 2002.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff suffers from carpal tunnel syndrome, an occupational disease, which was due to causes and conditions characteristic of and peculiar to her particular employment with defendant-employer, and which is not an ordinary disease of life to which the general public is equally exposed. N.C. Gen. Stat. § 97-53(13).
2. As a result of plaintiff's carpal tunnel syndrome, plaintiff is entitled to temporary partial disability benefits at a weekly compensation rate equal to sixty-six and two-thirds (66 2/3%) percent of the difference between her average weekly wages before the injury ($319.41) and the average weekly wages she earned thereafter while she was on restricted light duty under the orders of Dr. Lowne and Dr. Kuzma from June 21, 2002, through August 27, 2002, the date of her surgery. N.C. Gen. Stat. § 97-30.
3. As a result of plaintiff's carpal tunnel syndrome, plaintiff is entitled to temporary total disability benefits from August 27, 2002, the date of her surgery, through December 30, 2002, when she was released to return to work. N.C. Gen. Stat. § 97-29.
4. Because plaintiff is at maximum medical improvement, she is entitled to elect the more munificent remedy: (a) continuing compensation for diminished wage loss following her return to work on December 30, 2002, per N.C. Gen. Stat. § 97-30; or (b) payment for the five-percent (5%) permanent partial disability rating to her left hand per N.C. Gen. Stat. § 97-31. Absent evidence of the exact diminution of plaintiff's earnings, the Full Commission is unable to assess the greater remedy.
5. Plaintiff is entitled to have defendants pay for plaintiff's medical expenses incurred or to be incurred regarding her carpal tunnel syndrome, for so long as such evaluations, examinations, and treatments may reasonably required to effect a cure, give relief, or lessen the period of plaintiff's disability. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
 *********** ORDER
This matter is hereby remanded to Chief Deputy Commissioner Stephen T. Gheen for assignment to a Deputy Commissioner for the taking of additional evidence or further hearing, if necessary, and the entry of an Opinion and Award with findings regarding the extent to which plaintiff has suffered a diminution of her earning capacity for the period following December 30, 2002, so that a determination may be made as to the more munificent remedy available to plaintiff following here reaching maximum medical improvement.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to plaintiff in lump sum temporary partial disability benefits at a weekly compensation rate equal to sixty-six and two-thirds percent (66 2/3%) of the difference between her average weekly wages before the injury ($319.41) and the average weekly wages she earned thereafter while she was on restricted light duty under the order of Dr. Lowne and Dr. Kuzma from June 21, 2002, through August 27, 2002, the date of her surgery. This award is subject to the attorney fee provided herein.
2. Defendants shall pay to plaintiff in lump sum temporary total disability benefits from August 27, 2002, the date of her surgery, through December 30, 2002, when she was released to return to work. This award is subject to the attorney fee provided herein.
3. Defendant shall pay to plaintiff, upon her election, the more munificent remedy: (a) continuing compensation for diminished wage loss following her return to work on December 30, 2002, per N.C. Gen. Stat. §97-30; or (b) payment for the five-percent (5%) permanent partial disability rating to her left hand per N.C. Gen. Stat. § 97-31. Absent evidence of the exact diminution of plaintiff's earnings, the Full Commission has remanded this matter to a Deputy Commissioner, as providedsupra. This award shall be subject to the attorney fee provided herein.
4. Defendants shall pay for plaintiff's medical expenses incurred or to be incurred regarding her carpal tunnel syndrome, for so long as such evaluations, examinations, and treatments may reasonably required to effect a cure, give relief, or lessen the period of plaintiff's disability.
5. Defendants shall pay directly to plaintiff's counsel a reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded to plaintiff in paragraphs 1, 2, and 3 of this award.
6. Defendants shall pay the costs due the Commission.
This 20th day of December 2004.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER